IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| PRESTIGE CAPITAL CORPORATION, | |
| Plaintiff, | |
| v. | CIV. NO. 10-2155(PG) |
| PIPELINERS OF PUERTO RICO, INC.; PUERTO RICO AQUEDUCT AND SEWER AUTHORITY; AND ECONOMIC DEVELOPMENT BANK FOR PUERTO RICO, | |
| Defendants. | |

## OPINION & ORDER

This is a diversity action stemming from a dispute between secured creditors as to the relative priority of their security interests over certain collateral. Plaintiff Prestige Capital Corporation (hereinafter "Prestige") and co-defendant Economic Development Bank for Puerto Rico (hereinafter "EDB") are secured creditors of debtor and co-defendant Pipeliners of Puerto Rico (hereinafter "Pipeliners"). Pending before the Court are Prestige and EDB's cross motions for summary judgment with their respective replies, as well as Prestige's Motion for Summary Judgment against Pipeliners. Dockets No. 8, 32, 47 and 61.[1] For the reasons set forth below, The Court **GRANTS** Prestige's Motion for Summary Judgment against EDB, **DENIES** EDB's Motion for Summary Judgment against Prestige, and **GRANTS IN PART AND DENIES IN PART** Prestige's Motion for Summary Judgment against Pipeliners.

### I. Background

The following is a narrative of the uncontested facts as stipulated between Prestige and EDB in their respective motions for summary judgment.

**A. The Purchase and Sale Agreement Between Prestige and Pipeliners**

Prestige is a New Jersey Corporation which provides accounts

---

[1] Pipeliners did not oppose Prestige's Motion for Summary Judgment against it.

receivables financing. On June 9, 2005 Prestige and Pipeliners entered into a Purchase and Sale Agreement (the "P&S Agreement") and an amendment thereto on November 7, 2006. Docket No. 1-A. Pursuant to the P&S Agreement, Pipeliners agreed to sell, and Prestige agreed to purchase, from time to time, certain accounts receivables and contract rights of Pipeliners. Section 7 of the Agreement states that Pipeliners is liable to Prestige for the amounts due on accounts that are not paid within 90 days of the invoice date. Id.

Pursuant to Section 11 of the P&S Agreement, Pipeliners granted Prestige a continuing security interest in all of its accounts receivables, among other assets, as security for the payment of any unpaid invoices. Said section reads as follows:

> As a further inducement for Prestige to enter into this Agreement, and as security for the prompt performance, observance and payment of all obligations owing by [Pipeliners] to Prestige, [Pipeliners] hereby grants to Prestige a continuing security interest in and lien upon the following (herein collectively referred to as the "Collateral"): all accounts, inventory, instruments, documents, chattel paper and general intangibles ( as such terms are defined in the Uniform Commercial Code), whether now owned or hereafter acquired by [Pipeliners], wherever located, and all replacements and substitutions therefore, accessions thereto, and products and proceeds thereof, and all property of [Pipeliners] at any time in Prestige's possession. Id. (our emphasis).

On June 16, 2005 Prestige attempted to perfect its security interest by filing and executing a UCC-1 form with the Puerto Rico Department of State. Docket No. 1-B. Said form identified the same collateral as that reflected on the P&S Agreement. On November 15, 2007, Prestige filed a UCC-3 form with the Puerto Department of State in order to evidence a name change of Pipeliners.[2] Id.

## B. The EDB – Pipeliners Loan Agreement

Three years later, on July 22, 2010, Pipeliners and EDB executed a Loan Agreement pursuant to which EDB granted Pipeliners a revolving line of credit in the amount of $2,000,000 (the "EDB Loan"). Section 3.04 of said agreement contained the "Collateral and Guarantees" clause, which

---

[2] The earlier filing had identified "The Oil & Grease Company, Inc." as the debtor, which is Pipeliners, Inc.'s former business name.

Civil No. 10-2155(PG)                                                    Page 3

stated, <u>inter alia</u>,

> As evidence and/or collateral to secure the obligations of [Pipeliners]
> under this Contract, including without limitation, the payment of the
> Loan principal and its interests, any other advance or disbursement
> made by [EDB] under this Contract, plus the liquid sum paid for costs,
> expenses and attorney's fees, [Pipeliners] shall give to [EDB] the
> following collaterals and securities:
> a) Notified assignment regarding <u>accounts receivable</u> of all current and
> future contracts.
> b) Uniform Commercial Code (UCC) Filing (Security Interest Agreement)
> on movable assets, inventory, <u>present and future accounts receivable</u>,
> cash, and the product of any of them.... Docket No. 53-1.

Section 3.02(b) of the agreement also stated that "[t]he term of the loan
shall be one (1) year. The repayment shall be made from the direct
assignment of payments based on eighty percent (80%) of the invoices to be
collected of [the Puerto Rico Aqueduct and Sewer Authority] up to a maximum
of two million dollars..." <u>Id.</u>, <u>see also</u> Terms Letter signed by Pipeliners
and EDB, Docket No. 53-2.

On July 28, 2010 EDB attempted to perfect its security interest in the
Pipeliners collateral by filing a Financing Statement with the Puerto Rico
Department of State. Said Financing Statement covered the following
collateral:

> A) All movable assets, equipment, valuables, intangible assets,
> negotiable documents, instruments, inventory, machinery, <u>accounts
> receivable</u>, books, records, files, materials, and documents, located or
> used in the operation of the business of [Pipeliners] indicated above,
> or in any other one which it has or may have in the future, or in any
> place or location where they may be, and all of the assets in Exhibit
> "A," if any, of this contract, as amended from time to time, and also
> including any other assets subsequently acquired, whether by barter,
> replacement or purchase.
> B) All interests, cash, instruments, and other properties received from
> time to time, or otherwise distributed in relation to, or exchange for,
> any of the properties described above, including their respective
> replacements, substitutes, and products, and any books, records and
> documents directly or indirectly related to them.
> C) All products, interests or properties, of any kind, yield by the
> aforementioned assets. Docket No. 53-2 (our emphasis).

It follows that both EDB and Prestige have overlapping security
interests as to all of Pipeliners accounts receivables, including account
receivables due from the Puerto Rico Aqueduct and Sewer Authority (PRASA),
which are at the center of this action.

**C. Subsequent Controversy Between Prestige and EDB**

Civil No. 10-2155(PG)                                                Page 4

On August 19, 2010, counsel for Prestige sent a letter to the attorney and public notary who drafted and executed the closing documents for the EDB Loan. In it, Prestige alleged that it held a senior security interest encumbering the same collateral as EDB's security interest and demanded that EDB turn over any proceeds deriving from said collateral. Docket No. 1-C. Two months later, on October 21, 2010, EDB sent a letter to Pipeliners indicating that it had defaulted on the terms of the EDB Loan Agreement by not disclosing the alleged liens held by Prestige. Docket No. 8-4. This purported failure to disclose effectively triggered an acceleration clause in the EDB Loan Agreement, rendering the EDB Loan immediately due and payable. Id.

On November 23, 2010, Prestige served its own letter to Pipeliners indicating that it was in default of the terms and conditions under the P&S Agreement, owing Prestige the alleged sum of "no less than $1,210,527.18," plus accrued interest and costs. Docket No. 1-D. Prestige demanded immediate payment of said amounts. Id. As of January 5, 2011, Prestige claims these amounts have increased to $1,280,280.87. See Dockets No. 8-1 and 33.

Co-defendant Puerto Rico Aqueduct and Sewer Authority (PRASA) is one of the account debtors of Pipeliners. On November 30, 2010, Prestige also served a notice of foreclosure of Pipeliners' accounts receivables to PRASA. Docket No. 1-E.

EDB, on its part, claims that as of March 29, 2011, Pipeliners owes it the sum of $386,037.19 under the EDB Loan Agreement. Docket No. 33-13. Both Prestige and EDB are now looking to foreclose on Pipeliners' PRASA account receivables in order to satisfy the repayment of their disbursements to Pipeliners. To that effect, Prestige has filed the instant action before this Court requesting: (1) a declaratory judgment that it is the senior secured creditor of Pipeliners; (2) an order directing PRASA to pay the not less than $333,230.91 it owes Pipeliners directly to Prestige; (3) that the Court declare Pipeliners in default of its obligations under

the P&S Agreement; and (4) order Pipeliners to pay Prestige an amount of not less than $1,211,968.66, plus accruing costs and fees, for amounts advanced by Prestige to Pipeliners under the P&S Agreement.

PRASA, on its part, filed an interpleader action before the Puerto Rico Court of First Instance, wherein it averred that it is subject to multiple liability arising from the same contracts to multiple parties, consigned the sum of $653,951.97, and pleaded the Commonwealth Court determine to whom such amounts were due.[3] Docket No. 33-12.

Both Prestige and EDB have filed cross-motions for summary judgment, with Prestige also moving for summary judgment against Pipeliners. The Court will discuss these motions below after outlining the applicable standard of review in this case.

## II. Standard of Review

A motion for summary judgment is governed by Rule 56(c) of the Federal Rules of Civil Procedure, which allows disposition of a case if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." See Sands v. Ridlefilm Corp., 212 F.3d 657, 660 (1st Cir.2000). A factual dispute is "genuine" if it could be resolved in favor of either party, and "material" if it potentially affects the outcome of the case. See Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 19 (1st Cir.2004).

To be successful in its attempt, the moving party must demonstrate the absence of a genuine issue as to any outcome-determinative fact in the record, see DeNovellis v. Shalala, 124 F.3d 298, 306 (1st Cir.1997), through definite and competent evidence. See Maldonado-Denis v. Castillo Rodriguez, 23 F.3d 576, 581 (1st Cir.1994). Once the movant has averred that there is an absence of evidence to support the non-moving party's case, the burden shifts to the

---

[3] The complaint lists the Oil and Grease Company, "Pipelines" of Puerto Rico, Inc., Prestige Capital Corporation, Endurance Reinsurance Corporation of America, Economic Development Bank of Puerto Rico and The Internal Revenue Department as Defendants. See Civil Case No. KAC2010-1450, filed on December 3, 2010.

non-movant to establish the existence of at least one fact in issue that is both genuine and material. See Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir.1990) (citations omitted). If the non-movant generates uncertainty as to the true state of any material fact, the movant's efforts should be deemed unavailing. See Suarez v. Pueblo Int'l, 229 F.3d 49, 53 (1st Cir.2000). Nonetheless, the mere existence of "some alleged factual dispute between the parties will not affect an otherwise properly supported motion for summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). However, "summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir.1990).

At the summary judgment juncture, the Court must examine the facts in the light most favorable to the non-movant, indulging that party with all possible inferences to be derived from the facts. See Rochester Ford Sales, Inc. v. Ford Motor Co., 287 F.3d 32, 38 (1st Cir.2002). The Court must review the record "taken as a whole," and "may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 150 (2000). This is so, because credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. Id.

### III. Discussion

The Court begins the discussion by addressing Prestige and EDB's claims against each other on their cross-motions for summary judgment, followed by a discussion of Prestige's claims against Pipeliners.

**A. Prestige's and EDB's cross-motions for summary judgment**

In its Motion for Partial Summary Judgment, Prestige requests the Court: (1) declare that it is the senior secured creditor of Pipeliners as to non-bonded invoices; (2) declare that any payments due to Pipeliners be directed to Prestige until it is paid in full for the amounts owed; and (3) impose payment of attorney fees upon EDB. Docket No. 8.

EDB opposes Prestige's motion by alleging that: (1) the transfer of the PRASA accounts to Prestige as collateral was null and void under the Puerto Rico Assignment of Claims Act (PRAOCA), which prohibits the transfer of government contracts by creditors to third parties unless certain conditions are met, see P.R. LAWS ANN. tit. 3, §§ 901-02; (2) EDB will suffer unjust enrichment if Prestige's liens are recognized as having first priority; and (3) that in any event Prestige waived its rights over the collateral by its own acts. EDB thus moves for summary judgment in its favor and also requests a declaratory judgment that it holds a first priority lien over the PRASA accounts. Docket No. 32.

### i. The Puerto Rico Assignment of Claims Act (PRAOCA)

EDB posits that Pipeliners' granting of a security interest on all of its accounts receivables was null and void as to the accounts held by Pipeliners against PRASA. EDB bases its contention on articles 200 and 201 of the Puerto Rico Political Code, which are referred to as the PRAOCA. Article 200 states that:

> Without prejudice to the exception provided in the three (3) final paragraphs of § 902 of this title, no contract or order, or any interest therein, shall be transferred by the party to whom such contract or order is given to any other party, and any such transfer shall cause the annulment of the contract or order transferred as far as the Commonwealth of Puerto Rico is concerned. P.R. LAWS ANN. tit. 3, § 901.

Article 201, on its part, states that:

> All transfers and assignments made of any claim upon or against the Commonwealth of Puerto Rico, or of any parts or share thereof, or interest therein, whether absolute or conditional, and whatever may be the consideration therefor, and all powers of attorneys, orders, or other authorities for receiving payment of any such claim, or any part or share thereof, shall be absolutely null and void, unless they are freely made and executed in the presence of at least two (2) attesting witnesses, after the allowance of such claim by the Secretary of the Treasury, the ascertainment of the amount due, and the issuing of a warrant for the payment thereof. P.R. LAWS ANN. tit. 3, § 902.

It follows that both articles establish a general prohibition as to the "transfers and assignments" of government contracts unless certain conditions are met. The statute does not define the terms "transfers and assignments" and so it is unclear whether under Puerto Rico law those terms

can encompass the attachment of security interests in account receivables. It could be that the terms refer to those transactions made pursuant to article 1065 of the Puerto Rico Civil Code (PRCC), which was in effect in 1902 when the PRAOCA was enacted. Said article states that "[a]ll the rights acquired by virtue of an obligation are transmissible, subject to law, should there be no stipulation to the contrary." P.R. Laws Ann. tit. 31, § 3029.

The Supreme Court of Puerto Rico has described these transactions as "a legal business executed by the assignor with another person, the assignee, by virtue of which the former transfers to the latter the ownership of the right of the assigned credit." IBEC v. Banco Comercial, 17 P.R. Offic. Trans. 446 (1986) (internal citations omitted). These assignments are the "operation whereby a third person, substituting the creditor, comes into the possession of an obligation that, nonetheless, remains the same." Id.

With respect to the granting of security interests in accounts receivables, however, the applicable law is the Puerto Rico Commercial Transactions Act (UCC-PR). The UCC-PR contains a modified version of Article 9 of the Uniform Commercial Code, which governs secured transactions in general. See P.R. Laws Ann. tit. 19, §§ 2001-2207. Section 9-203 of the UCC-PR explains that a creditor's security interest attaches to the debtor's collateral when "the debtor has signed a security agreement which contains a description of the collateral"; "value has been given"; and "the debtor has rights in the collateral." P.R. Laws Ann. tit. 19, § 2053(1)-(2). Upon attachment of the security interest, the creditor becomes a secured party with an enforceable right in the collateral. See id. Generally, if the secured party wishes to perfect his interest in the collateral, it must file a financing statement with the Puerto Rico Secretary of State. See P.R. Laws Ann. tit. 19, § 2102(1); Angulo-Mestas v. Editorial Televisa Intern., S.A., 747 F.Supp.2d 255, 258-59 (D.P.R. 2010).

As long as the debtor is not in default, he or she can: (1) use, commingle or dispose of all or part of the collateral; (2) or collect or

compromise accounts or chattel paper; (3) accept the return of goods or make repossessions; or (4) use, commingle or dispose of proceeds.[4] P.R. LAWS ANN. tit. 19, § 2055. This is in stark contrast to assignments of credits carried out under art. 1065 of the Civil Code, where the assignor generally retains no rights as to the credit once it is transferred to the assignee.[5]

Nevertheless, the Court notes that case law from the U.S. Supreme Court and other sister federal courts interpreting assignment of claims statutes analogous to the PRAOCA have in instances understood that the attachment of security interests in government receivables falls within the ambit of such statutes. However, these courts have held that those statutes have no bearing on disputes between secured creditors over the priority of their liens. One example is the "Act To Prevent Frauds Upon The Treasury Of The United States" (the "Frauds Act") which was enacted in 1853. 10 Stat. 170 (1853).[6] The Frauds Act also establishes a general prohibition against any "transfers and assignments" of any claims against the United States, and probably served as a model for the PRAOCA, as both statutes are nearly identical.[7]

--------------------------------------------------------

[4] Unless, of course, the secured creditor has retained possession of the collateral.

[5] Moreover, the Court notes that section 9-102 of the Commercial Transactions Act states that the provisions of the Civil Code of Puerto Rico with respect to "transmission of credits" shall not apply to transactions governed by the Commercial Transactions Act. P.R. LAWS ANN. tit. 19, § 2002(4). The Court believes that this provision indicates that both types of transactions were meant to be treated as separately regulated.

[6] Later recodified at 31 U.S.C. § 203 and again in 1982 as 31 U.S.C. §3727, 96 Stat. 976, by P.L. 97-258 §1. While codified at 31 U.S.C. §203, the statute read as follows: 'All transfers and assignments made of any claim upon the United States, or of any part or share thereof, or interest therein, whether absolute or conditional, and whatever may be the consideration therefor, and all powers of attorney, orders, or other authorities for receiving payment of any such claim, or of any part or share, thereof, (with inapplicable exceptions), shall be absolutely null and void, unless they are freely made and executed in the presence of at least two attesting witnesses, after the allowance of such a claim, the ascertainment of the amount due, and the issuing of a warrant for the payment thereof."

[7] In 1940, Congress amended the Frauds Act pursuant to the Federal Assignment of Claims Act (FAOCA) to allow assignments of government receivables to financial institutions. In 1967, the legislature of Puerto Rico adopted a similar amendment to allow assignments to financial institutions provided that certain notice

Civil No. 10-2155(PG)                                              Page 10

    As the name of the Frauds Act suggests, its purpose is merely to
prevent frauds upon the Treasury, and not to protect the parties to the
assignment. United States v. Shannon, 342 U.S. 288, 291(1952). The Act was
meant to prevent persons of influence from buying up claims against the
United States, as well as the danger of the federal government having to
pay the same claim twice. United States v. Aetna Casualty & Surety Co., 338
U.S. 366, 373 (1949); see also Hobbs v. McLean, 117 U.S. 576 (1886).

    Courts have excused failure to comply with the Frauds Act when to do
so would not be subversive of public policy or within the dangers which the
statute was passed to prevent. Despite its broad language, the Supreme
Court has held that the Frauds Act 'must be interpreted in the light of its
purpose to give protection to the Government' so that between the parties
effect might still be given to an assignment that failed to comply with the
statute. Martin v. National Surety Co., 300 U.S. 588, 596 (1937). The Court
reasoned that "the Government is not concerned to regulate the equities of
claimants growing out of irregular assignments when collection is complete
and liability is ended." Id, at 595. Thus, after claims have been collected
by the assignor, there is no further danger that the Government might
become "embroiled in conflicting claims, with delay and embarrassment and
the chance of multiple liability." Id. at 594; see also Segal v. Rochelle,
382 U.S. 375 (1966)( Debtor's right to tax refunds, as yet unpaid, were
transferable prior to bankruptcy regardless of compliance with the Claims
Act).

    The Supreme Court again addressed this issue in McKenzie v. Irving
Trust Co., 323 U.S. 365 (1945), and dismissed a complaint brought by a
trustee in bankruptcy to recover money paid by the debtor to its creditor
pursuant to an assignment which had not complied with the Act. The Court
again noted that the Act is for the protection of the government and not
the regulation of the equities of the claimants as between themselves. Id.,
at 369. The Court deemed non-compliance with the Act irrelevant as the

_____

requirements are made.

payment had already been paid over by the government. Id.

The Bankruptcy Court presiding over In Re Altek Systems, Inc., 14. Bankr. R. 144 (Bank. Ct. N.D. 1981), held that the Act had no bearing on a security interest previously perfected pursuant to art. 9 of the UCC, even if only one of the parties had complied with the Act, because the federal government was not in need of protection. The court held that where the government is not a party, is not in danger of being defrauded, and has no claims pending against it, it is in no need of protection and it would be incongruous to apply the Claims Act in a dispute between non-governmental claimants. See also Mayo v. Pioneer Bank & Trust Co., 270 F.2d 823 (5th Cir.1959), cert. denied 362 U.S. 962 (1960) [When the government has paid or honored a claim, or no longer has any vital interest, the assignment is good between the parties or their successors in interest in spite of the fact that the government was not given notice of the assignment as required by the Federal Assignment of Claims Act].

Prestige requests the Court apply the equity principles established by the cases above and declare that it holds a senior security interest to that of EDB. EDB counters that these cases should not be applied in the present case, as Puerto Rico is a civil law jurisdiction, the PRAOCA is unambiguous, and that in any event the relevant case law would seem to mandate outright nullity of Prestige's security interest, as EDB is a government entity in need of protection.

The Court finds EDB's arguments unavailing. First, and as previously explained, the words "transfers and assignments" in the PRAOCA are not unambiguous. The statute does not define them, nor was the UCC-PR in effect when the statute was adopted. Second, we do not believe that EDB is the type of government entity that was meant to be protected by the PRAOCA and the above case law.

EDB is a public corporation vested with similar rights as that of PRASA under the laws of Puerto Rico, namely to sue and be sued, incur in debts and extend loans, among others. P.R. LAWS ANN. tit. 7, §§ 611-611p. EDB is also tasked with offering, designing and providing diverse financing

alternatives for Puerto Rico's small and medium businesses, as well as aspiring business owners. The Court finds it hard to believe that an entity with such expertise failed to be appraised of Prestige's pre-existing security interest, which had been perfected five years before EDB's own interest. Notwithstanding this, EDB claims it must be protected against Prestige's competing security interest. The Court finds, however, that the PRAOCA was meant to protect the government only when it acted as a payor, and not as a payee as is the case here. The drafters of the statute were concerned that allowing government creditors to freely assign government receivables without notice would potentially place the government in the dangerous position of having to pay the same claim twice. One could easily appreciate how persons intent on defrauding the treasury could take advantage of the lack of requirements governing assignment of government contracts.

This is not the case here. Nothing in the record suggests that Prestige is attempting to defraud the treasury of Puerto Rico. Prestige provided Pipeliners with financing so that it could continue its operations providing services to its clients, namely the Government of Puerto Rico. There is also no danger of the government having to pay the same claim twice as PRASA has already consigned the funds with the Puerto Rico Court of First Instance in its interpleader action. Thus, the Court concludes that the PRAOCA should not apply to invalidate Prestige's liens, and subsequently those liens have priority over EDB's liens as to the PRASA accounts.

Prestige duly attached and perfected its security agreement on all of Pipeliners account receivables. The P&S Agreement signed by both Pipeliners and Prestige satisfied the requirements of the UCC-PR; namely: (1) it was signed by Pipeliners and contained a description of the collateral; (2) value was given; and (3) Pipeliners had rights in the collateral. Furthermore, Prestige duly filed and perfected its security interest, as evidenced by its respective UCC-1 and UCC-3 Filings. Docket No. 1-B.

Although EDB contests the fact that Prestige filed the UCC-3 form at all,[8] the record clearly shows that such filing was made in accordance with UCC-PR at the Puerto Rico Department of State on November 15, 2007. We cannot ascribe fault to Prestige for the mere fact that Prestige's filing failed to appear registered at the time EDB conducted its title search.

Once a debtor like Pipeliners is in default, the secured party is entitled to reduce its claim to judgment, foreclose or otherwise enforce the security interest by any available judicial procedure. P.R. LAWS ANN. tit. 19, § 2201. Although EDB argues that this would allow Prestige to commit "an ambush" on public funds being held by PRASA, and that the PRAOCA would effectively bar such enforcement of a security interest against a public corporation, the Supreme Court of Puerto Rico has in the past allowed third parties to enforce unsecured debts owed to them by contractors of PRASA, against PRASA.

In Arraiza v. Reyes, 70 D.P.R. 614 (1949), The Supreme Court held that in an action for collection of monies a creditor-plaintiff has the right to attach funds owed by a public corporation to the debtor-defendant. There, a creditor sued its debtor, a contractor of PRASA, who was owed by PRASA certain monies as consideration for completed works. The creditor attempted to levy an attachment of those monies in possession of PRASA, and the Supreme Court held that although PRASA was a public corporation, it was amenable to judicial proceedings seeking attachment of funds in its possession. The Court reasoned that the Legislature's granting of certain powers to PRASA--namely to sue and be sued, acquire goods and incur in debts, as well as the ability to keep its funds separate from those of the central government—reflected a clear legislative intent to subject PRASA

_____

[8] EDB conducted a search of the Corporation Division of UCC's in the Department of State of Puerto Rico, but the resulting report, current as of February 28, 2010, did not reflect Prestige as one of the secured creditors of Pipeliners on file. The Court has no information as to the cause of said omission, whether it was due to negligence on the part of EDB's title searcher or of the Puerto Rico Department of State. Regardless, even if it was due to the negligence of the Puerto Rico Department of State, EDB has provided us with no authority or case law from which to conclude that such negligence invalidated Prestige's lien.

to most types of judicial proceedings, as a private enterprise would be in analogous circumstances.[9] This, the Court stated, as long as the proceeding did not interfere with PRASA's execution of its executive functions.

Therefore, if attachment proceedings against PRASA by unsecured creditors seeking to collect debts from PRASA's creditors are allowed under Puerto Rico law, it would be hard to believe that secured creditors in the same position would not be allowed to do the same. Thus, the Court believes that under Puerto Rico law the result would be the same: in any instance, Prestige would be allowed to assert the priority of its liens in an attachment proceeding against PRASA, despite its failure to comply with the PRAOCA.

Important public policy concerns would also seem to warrant this result. First and foremost, the Government has a vested interest in its contractors being able to obtain financing from as many sources as possible, both within Puerto Rico and abroad. This ensures that a variety of contractors can vigorously compete for the same government contracts, which would benefit the public taxpayer. Denying Prestige priority as to its liens may have the adverse effect of crowding out financing opportunities for potential government contractors. Second, applying the PRAOCA to these facts would have the unfavorable result of rewarding the government for conducting a defective title search, in detriment to a foreign corporation which had provided financing five years earlier to the debtor, allowing it to fulfill its obligations to the government. Although the Court does not wish to reward Prestige for its failure to comply with PRAOCA, the Court believes this to be the most appropriate result.

Thus, the Court concludes that the PRAOCA is inapplicable to the case at bar.

**ii. Estoppel**

---

[9] See Puerto Rico Aqueduct and Sewer Authority Act, P.R. Laws Ann. tit. 22, § 141 et seq. We should note that PRASA may not be sued for damages arising "from the real or alleged impurity, irregularity, or insufficiency of the water supplied by it".22 LPRA 144(c).  Also, judicial sales of properties of PRASA are prohibited. Id.

EDB also argues that Prestige led it to believe that it did not have a security interest or did not intend to enforce a security interest over the PRASA accounts. EDB claims that Prestige: (1) did not file an assignment document at PRASA to preserve and notify its alleged security interest in Pipeliners' accounts receivables; and (2) did not object to the assignment of the PRASA accounts to EDB as collateral under the EDB Loan Agreement, even though those assignments were openly discussed in their presence. As a result of these actions, EDB claims it proceeded in good faith to make disbursements to Pipeliners.

As to the first point, Prestige admits that it did not file an assignment document at PRASA concerning its security interest over the PRASA accounts. Although this seems to be based on a mistake of law on Prestige's part, the Court believes that this omission does not constitute a waiver of Prestige's first priority liens over the PRASA accounts. The Court concludes, and Prestige seems to admit, that the only consequence of said omission is that PRASA is not obligated to make payments directly to Prestige extrajudicially. See Docket No. 47, p. 10. Nevertheless, and pursuant to the aforementioned case law, Prestige's failure to comply with the PRAOCA unaffected the priority of its liens relative to EDB.

As to the second point, that Prestige did not object to Pipeliners assigning the PRASA accounts to EDB during a meeting held on August 9, 2010, EDB presents an affidavit sworn by its own Vice President of Finance and Operations. See Docket No. 33-4. Although a party's own affidavit, containing relevant information of which she has first-hand knowledge, may be self-serving, it is nonetheless competent to support or defeat summary judgment. See Cadle Co. v. Holmes, 116 F.3d 957 (1st Cir. 1997). However, in this case the affidavit in question does not contain sufficient specific facts based on personal knowledge as to what exactly was said by the parties during the meeting. The document only states that on August 9, 2011 representatives of Prestige, EDB, PRASA and Pipeliners met to discuss the distribution of Pipeliners' PRASA accounts receivables, and that during that meeting "Prestige did not raise any objection as to the assignment of

Civil No. 10-2155(PG)                                          Page 16

certain PRASA accounts to EDB as collateral for the Pipeliners." We find
that, even assuming the statement to be true, Prestige's failure to object
did not necessarily constitute a waiver of its rights against the PRASA
accounts. It may be that its alleged failure to object only meant that
Prestige had no qualms about EDB perfecting a junior security interest
against the referenced collateral.

In any case, the Court is left with insufficient facts from which to
adequately address EDB's estoppel argument. Self-serving affidavits that
do not "contain adequate specific factual information based on personal
knowledge" are insufficient to defeat a motion for summary judgment, let
alone to sustain one. Quiñones v. Houser Buick, 436 F.3d 284, 290 (1st Cir.
2006). Moreover, even if the Court could conclude that Prestige orally
waived its rights, EDB would face difficulty in enforcing such oral waiver
due to the Puerto Rico Statute of Frauds. See P.R. Comm. Cod. Art. 82, P.R.
Laws Ann. tit. 10, § 1302.

Based on the above, the Court rejects EDB's estoppel arguments and
thus deems them insufficient to defeat summary judgment.

### iii. Unjust Enrichment

EDB's last argument is that recognizing Prestige's senior security
interest over the PRASA accounts would tantamount to an unjust enrichment
under Puerto Rico law. Article 7 of the Puerto Rico Civil Code states that
"[w]hen there is no statute applicable to the case at issue, the court
shall decide in accordance with equity, which means that natural justice,
as embodied in the general principles of jurisprudence and in accepted and
established usages and customs, shall be taken into consideration." The
Supreme Court of Puerto Rico has held that the doctrine of unjust
enrichment, being an equitable remedy, applies only "when the laws have not
foreseen a situation where a patrimonial shift occurs, which shift cannot
be rationally explained by the prevalent body of laws." Ortiz Andujar v.
E.L.A., 22 P.R. Offic. Trans. 774, 780 (1988)(internal quotations and
citations omitted). Such is not the case here.

The UCC-PR exhaustively provides the legal framework pursuant to which

liens are attached and perfected, as well as their priorities, subordination and foreclosures. What EDB calls a "displacement of wealth" is really the result of the provisions of the UCC-PR which confer priority status to liens on a seniority basis. Thus, we reject EDB's invitation to apply the doctrine of unjust enrichment to the facts of this case, as there is no absence of applicable law.

## B. Prestige's Motion for Summary Judgment Against Pipeliners

Prestige further requests the Court enter partial summary judgment on its breach of contract and collection of monies claims against Pipeliners, as well as a declaratory judgment declaring Pipeliners in default of its obligations under the P&S Agreement. As a result of said default, Prestige claims that Pipeliners is liable to it for the total amounts outstanding under the P&S Agreement, which amount to not less than $1,280,280.87, plus costs and fees.

Pipeliners has neglected to oppose Prestige's motion for summary judgment against it. However, whether or not opposed, summary judgment can only be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); Carmona v. Toledo, 215 F.3d 124, n.9 (1st Cir. 2000); see also Fed.R.Civ.P. 56(e) (if adverse party fails to respond, "summary judgment, *if appropriate*, shall be entered")(emphasis added).

In paragraph no. 20 of its complaint, Prestige alleged that as of November 23, 2010, Pipeliners was in default of an amount of not less than $1,211,968.66. Docket No. 1, ¶ 20. Pipeliners responded in its answer to the complaint that it "affirmatively avers and acknowledges that it has a contractual obligation with [Prestige] to repay amounts approximate to those averred in paragraph number twenty of the Complaint". See Docket No. 29. Pipeliners also admitted that all the amounts advanced by Prestige to it were due and demandable and that "it had and still has the intent to pay

Prestige, but payment delays by PRASA together with EDB's interventions and multiple breaches of contract have impeded Pipeliners' efforts." Docket No. 29, ¶ 18.

On November 23, 2010 Prestige served a letter to Pipeliners indicating that it was in default of the terms and conditions under the P&S Agreement, and that it owed an outstanding balance of "not less than $1,210,527.18, plus accrued interest and costs." Prestige also demanded full and immediate payment of said amount. See Docket No. 1-D. Pipeliners admitted that it was served with said letter. Docket 29, ¶ 32.

Thus, both Prestige and Pipeliners seem to be in agreement that the amounts advanced by Prestige to Pipeliners are due and demandable. Given that Pipeliners was served a letter of default, and in the absence of any evidence suggesting that Pipeliners has complied with the demand for payment, the Court finds that Pipeliners is in default of the terms of the P&S Agreement and that Summary Judgment is appropriate in this matter.

The Court will defer making a determination as to the exact amount Prestige is entitled to recover from Pipeliners, as the parties have not submitted enough evidence for the Court to make a proper determination on that matter. This as Pipeliners did not admit in its answer to the complaint the exact amount to which it is liable to Prestige, and Prestige has only furnished the Court with its own affidavits and pleadings establishing the amounts it thinks it is owed under the P&S Agreement. For this reason, the Court denies in part Prestige's Motion for Summary Judgment against Pipeliners until such time as the parties present adequate evidence on the amounts owed by Pipeliners under the P&S Agreement.

### IV. Attorney's Fees

The Court notes that the legal issues presented by the parties have been complex as well as novel and thus finds that neither party has acted either obstinately or frivolously. As a result, the parties are ordered to bear their own costs and attorney's fees.

### V. Conclusion

Civil No. 10-2155(PG)                                                Page 19

        Based on the foregoing, the Court **GRANTS** Prestige's Motion for Partial
Summary Judgment against EDB and thus declares that Prestige holds a senior
security interest to that of EDB over Pipeliners' non-bonded invoices,
including the PRASA accounts. As a result, the Court hereby orders EDB to
turn over any proceeds it has received from the Pipeliners collateral to
Prestige until its claims are satisfied in full.

        Secondly, the Court **DENIES** EDB's Motion for Summary Judgment against
Prestige.

        And lastly, Prestige's Motion for Summary Judgment against Pipeliners
is **GRANTED IN PART** and **DENIED IN PART**, and thus the Court declares
Pipeliners to be in default of the terms of the P&S Agreement and defers
making any determination as to the exact amounts due to Prestige as a
result of Pipeliners' breach.

**IT IS SO ORDERED.**

        In San Juan, Puerto Rico, October 14, 2011.


                                        **S/ JUAN M. PEREZ-GIMENEZ**
                                        **JUAN M. PEREZ-GIMENEZ**
                                        **SENIOR U.S. DISTRICT JUDGE**